1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

12

13

14

15

16

17

18

| | |
|---|---|
| JOHN ANDERSON, JEREMY MATHIS, JOSEPH MEGNA, BRANDON OLLIVIER, JEFFREY PAYNE, and DARREN PERKINS,<br><br>                         Plaintiffs,<br><br>        v.<br><br>JILMA MENESES, in her official capacity as SECRETARY OF THE WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>                         Defendant. | CASE NO. 19-5574 RJB<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

19

20

21

22

        This matter comes before the Court on Defendant Jilma Meneses'[1] Motion for Summary Judgment (Dkt. 84) and the Plaintiffs' motion to strike (Dkt. 96).  The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

23

24

---

[1] Jilma Meneses replaced Cheryl Strange as the Washington State Department of Social and Health Services Secretary  on January 1, 2022.  Pursuant to a January 6, 2022 order, the caption has been amended to reflect this change.

The Plaintiffs here are residents at the Special Commitment Center ("SCC"), a post-sentence treatment facility for people designated by a court as sexually violent predators. Dkt. 1. They assert that the Defendant violated their Fourteenth Amendment right to equal protection by paying them less than others detained in mental health settings (in Secure Community Transition Facilities and Western State Hospital) and violated their Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment by subjecting them to unsafe working conditions. Dkt. 59. The Plaintiffs seek declaratory and injunctive relief, attorneys' fees and costs. *Id.* One of the Plaintiffs here, Joseph Megna, has been unconditionally released from the SCC. Dkt. 84-1. He concedes that the Defendant's motion for dismissal of his claims as moot should be granted. Dkt. 96. No further analysis on his claims is necessary and they should be dismissed.

The Defendant now moves for summary judgment on all the remaining Plaintiffs' claims. Dkt. 84. For the reasons provided below, the Defendant's motion (Dkt. 84) should be granted. The Plaintiffs' motion to strike the declaration of Jennifer Colbert, RN (Dkt. 896) should also be granted.

## I.   RELEVANT FACTS AND PROCEDURAL HISTORY

### A. FACTS

1. SCC

Established in 1990, the SCC is managed by the Washington Department of Social and Health Services. Dkt. 85, at 2. The SCC serves as a secure mental health facility to treat individuals deemed predatory sex offenders by a civil court. *Id.* It is not a criminal justice facility; residents are committed at the SCC after they have completed their criminal sentences. *Id.* The SCC is located on McNeil Island, Washington and is accessible by ferry and plane. Dkt.

85, at 1 and 2.  It currently houses around 156 residents, but this number changes over time as

people are released and admitted.  Dkt. 85, at 1.  SCC residents who are indigent are provided

clothing, bedding, hygiene and other items free of charge.  Dkt. 90.  Access to personal property

is carefully monitored and the SCC maintains property inventories for the residents.  Dkt. 90.

The SCC employs several medical, psychological, and social work staff.  Dkt. 85, at 2.

The treatment program for residents is based on a relapse prevention model, "with a range of

modalities including Cognitive Behavioral Therapy, Motivational Interviewing, and Dialectical

Behavior Therapy."  *Id.*  The main goal of treatment is to "reduce the likelihood of future sexual

offenses through addressing modifiable risk factors such as anti-social life goals and future

sexual offenses."  *Id.*  If a resident has significantly mitigated their risk, they may receive SCC

support to petition the court for approval to transition back into the community.  *Id.*  Residents

who do not participate (or fail to advance) in treatment sufficiently to mitigate their risk of

reoffending, remain at the SCC indefinitely.  Dkt. 85, at 2.

SCC residents are given an assessment on arrival and an Individualized Treatment Plan is

developed.  Dkt. 85, at 2-3.  These treatment plans provide specific programming to "meet

medical, psychiatric, chemical dependency, education, vocational, religious, cultural and

recreational needs" of the residents.  *Id.*, at 3.

The vocational portion of the treatment plans include training through the SCC's

Resident Vocational Program.  Dkt. 85.  The ultimate goal of the vocational program is to

"reintegrate into the community those residents who have progressed to the advanced phases of

treatment."  *Id.*  It's primary objective is to "provide residents . . . with basic work skills, work

experience and evaluation which can be of benefit in obtaining gainful employment following

their transition from SCC . . ."  Dkt. 85-1, at 2.  While "no SCC resident will be compelled to

1    participate in vocational training . . . [a] resident's unwillingness to participate . . . may be

2    reviewed as one component of their overall treatment and community readiness when

3    considering recommendations pertaining to least restrict alternative." *Id*., at 3.

4         Plaintiff Anderson states that he has resided at the SCC for almost 20 years and worked

5    for much of that time. Dkt. 98, at 3. He acknowledges that "he has learned a few things," but he

6    feels has not learned anything that would help him hold a job outside an institutional setting or

7    received some sort of vocational certificate. *Id.* Plaintiff Ollivier asserts that there "is no

8    significate training or benefit to the work program." Dkt. 99. Plaintiff Payne also contends that

9    "[n]o legitimate training program exists at SC for any of the alleged 'vocational' jobs." Dkt.

10   100, at 6.

11        Resident vocational activities are prioritized by a resident's participation in treatment.

12   Dkt. 85, at 4. Residents actively involved in their treatment are considered first for jobs that the

13   staff feels would promote their progress in treatment. *Id.* Each of the Plaintiffs in this lawsuit

14   applied for the vocational positions they hold or have held. Dkt. 86, at 3.

15        Positions available include resident lawn care worker, cook, food service worker, chapel

16   clerk, video and equipment clerk, recreation tool crib clerk, maintenance worker, library clerk,

17   and custodian. Dkt. 86-2, at 2-12.

18        Pay for SCC residents is related to their level of treatment. Dkt. 85, at 5. Pay is based

19   upon behavior levels (the level of security that SCC applies to the resident) and treatment phases.

20   Dkts. 85, at 5; and 86, at 2. Current pay ranges from $1/hour to $3/hour. Dkt. 86-1, at 2. "Pay

21   for special projects, including incentivized chores," is at a standardized rate. Dkt. 85, at 5 It can

22   be as much as $5/hour. *See* Dkt. 100, at 3. In 2008, the pay scale was larger (from $2.50/hour to

23   $7.16/hour). Dkt. 97-1, at 49. In 2010, after significant budget cuts, the residential vocational

24

plan budget was reduced resulting in a decrease in the hourly wages.  Dkt. 97-1, at 51.  The SCC

explained that it felt there was therapeutic value in work and wanted to maintain the same

number of possible positions for the residents.  Dkt. 97-1, at 51.  It also wanted to "continue to

maintain a salary incentive for Level and Phase advancement."  *Id*.  While they are paid for their

work, according to the SCC's Chief Executive Officer, "the primary purpose of the program is to

prepare the residents for life outside the total confinement facility."  Dkt. 85, at 5.

The SCC maintains trust funds for its residents.  Dkt. 89, at 2.  The resident's pay is

deposited in their trust accounts.  *Id.*  As of November 19, 2021, Plaintiff Anderson had $324.15,

as of December 6, 2021, Plaintiff Mathis had $1,399.69, as of December 6, 2021, Plaintiff

Ollivier had $4,093.03, as of November 24, 2021, Plaintiff Payne had $1,157.52, and as of

October 19, 2021, Plaintiff Perkins had $5.41 in their trust accounts.  Dkt. 89.

To work in a particular role, residents must meet the applicable safety training

requirements.  Dkt. 86, at 3.  For example, to "apply for a position as a resident cook, a resident

must have a food service and safety certificate A, issued by Pierce College, a food worker's

permit issued by the Pierce County Health Department, and also an Industrial Safety Certificate

issued by SCC."  Dkt. 86, at 3.  The SCC provides additional safety training to the residents

participating in the vocational program including ladder safety, blood borne pathogen training,

safe chemical handling, and safe lifting techniques.  Dkt. 86, at 5. Each of the Plaintiffs in this

case have completed several safety trainings.  Dkt. 86-16.

Plaintiffs Anderson, Ollivier, and Payne assert that the safety trainings are inadequate.

Dkts. 98-100.  For example, they point out that while a quiz is given relating to the blood borne

pathogen training, if someone does not get a perfect score, they are allowed to attempt the

questions they missed again until they pass.  Dkt. 97-1, at 6.  Further, the SCC does not have a

resident worker safety committee.  Dkt. 97-1, at 7.  No formal training is given to residents on

the proper selection of personal protective equipment ("PPE").  Dkt. 97-1, at 6.  The staff is

given limited training on PPE and will provide PPE to residents on request.  Dkt. 97-1, at 7.

When a resident worker custodian is in the "position of cleaning bio-hazards, such as smeared

feces," the SCC states that it "makes available to the resident worker hooded chemical resistant

coveralls with elastic cuffs and protective boots."  Dkt. 86, at 4.  The kitchens have non-slip pads

on the floor, and has fire extinguishers, oven mitts, safety aprons, and heavy-duty gloves

available.  *Id.*  Work gloves and eye protection are made available for those who work outside.

*Id.*

Plaintiff Anderson points to a time when he was directed to clean an area after a staff

member tested positive for COVID-19.  Dkt. 98, at 2.  He notes that he and the other resident

workers had to request masks, which were provided.  *Id.*  Plaintiff Ollivier states that he has been

employed at the SCC "to clean up blood, urine, and fecal matter" and asserts that the only safety

equipment he was given was latex exam gloves.  Dkt. 99, at 7.  (Plaintiffs note that the physician

at the SCC, Dr. Darey Philbrick, recommends that in some situations, a mask, goggles or face

shield, and a suit should be worn.  Dkt. 97-1, at 10).  Plaintiff Payne states that he accepted a job

cleaning up after a resident who would smear solid and liquefied fecal matter on walls doors and

ceilings.  Dkt. 100, at 2-3.  Plaintiff Payne asserts that he was not adequately trained or given

proper PPE.  *Id.*  He states that at one point he was given a biological suit that "was more porous

than a coffee filter."  *Id.,* at 4.  Plaintiff Payne raised the issue with staff and was provided "suits

that didn't leak and had booties on them."  *Id.*  He notes that if he wore the provided suits too

long, they would start to leak.  *Id.*  Plaintiff Payne asserts that he was never provided any face or

1   eye protection and he only wore vinyl exam gloves.  *Id.*, at 5.  He was eventually paid $5.00/hour

2   to do the work.  *Id*., at 3.

3           Resident workers have 24-hour access to the SCC's medical staff and facilities.  Dkt. 86,

4   at 4.  Medical services are provided at no cost to the resident.  *Id.* Only one of the Plaintiffs in

5   this lawsuit has been injured while performing work at the SCC. Dkt. 86, at 4.  Plaintiff Mathis

6   injured his foot with hot water while in the process of draining noodles in the kitchen.  Dkt. 86-

7   10, at 2.  The lower drain knob came off of a kettle and the hot water hit his foot.  *Id.*  Plaintiff

8   Mathis was seen by medical shortly after the incident.  *Id.*  The medical record indicates that the

9   foot was red "with no open areas." Dkt. 86-10, at 3.  A cold compress was applied.  *Id.*

10          Although Plaintiff Payne asserts that he developed a respiratory illness after about six

11  months after starting his biohazard job (Dkt. 100, at 5), there is no competent evidence in the

12  record that his illness is related to the job.  While the Plaintiffs point to additional accidents

13  involving other residents in 2014, these events are not material to the motion.  This case has not

14  been certified as a class action.

15          2.  Secure Community Transition Facilities

16          If a SCC resident makes a sufficient showing that they have made adequate progress in

17  their treatment to be safely managed in the community at a reduced threat of sexual re-offense, a

18  court may order the resident be conditionally released to a less restrictive alternative placement.

19  Dkt. 85, at 4.  Possible less restrictive alternative placements include Secure Community

20  Transition Facilities ("SCTF").  *Id.*  Placement in these facilities are "based on a resident's need

21  with regard [] for transition services, resources, family and social support, and access to

22  community destinations."  *Id.*  Prior to the Covid-19 pandemic (and unlike the residents at the

23  SCC) residents at the SCTF were allowed to leave McNeil Island to work and conduct personal

24

1    errands.  *Id.*, at 5.  Many SCTF residents would go to jobs (where they earned what the

2    community employer paid), deposit earnings in their bank, and do their own grocery and other

3    shopping.  *Id.*  The SCTF currently has a resident worker program where participants earn $7.16

4    per hour.  *Id.*  The SCTF residents cook their own food and budget their money to further their

5    transition to living in the community.  *Id.*

6          3.  <u>Western State Hospital</u>

7          Western State Hospital ("WSH") is a state-run hospital for a maximum of 850 residents

8    with various forms of mental illness. Dkt. 88.  Some of the patients have illnesses that are severe

9    and require long-term treatment.  *Id.*  Some have been, or are in the process of being, civilly

10   committed under RCW 71.05.  *Id.*  Others have been committed under RCW 10.77 for forensic

11   competency services or because they have been found not guilty by reason of insanity.  *Id.,* at 2.

12   WSH offers various treatment opportunities, including a program called the "Vocational Therapy

13   Program," which provides rehabilitative services through "a controlled, limited work program."

14   *Id.*  Only about 10%-20% of the WSH patients participate in the program.  *Id.*  Participation in

15   the program is limited by the program's budget and paid patient work cannot exceed the budget.

16   *Id.*  Patients do various types of work, including janitorial, custodial, horticultural or

17   administrative positions.  *Id.,* at 2-3.  They are paid $7.25 an hour and work for 15 minutes to 16

18   hours each week depending on "how the treatment team determines the program can best support

19   the patient's treatment plan."  *Id.,* at 3.  "The exact amount of time is determined by what would

20   be the most beneficial for the patient's treatment, and is limited by the patient's physical and

21   mental abilities."  *Id.*  Patients are sometime given one-on-one direct supervision as they work,

22   by WSH staff.  *Id.*

23

24

1

2    **B.  PROCEDURAL HISTORY**

3        This lawsuit was filed as a putative class action on June 24, 2019.  Dkt. 1.  Counsel was

4    appointed to represent the Plaintiffs on February 25, 2020. Dkt. 18.  The March 5, 2021 deadline

5    to file for class certification has now lapsed and no motion was filed.  Accordingly, this case will

     not be treated as a class action.  It is set to begin trial on December 12, 2022.  Dkt. 93.

6    **C.  PENDING MOTIONS**

7        The Defendant moves for summary judgment on all claims, arguing that the Plaintiffs'

8    claim that their Fourteenth Amendment rights to equal protection should be dismissed because

9    the Plaintiffs cannot show that they are similarly situated to the residents at the SCTF or the

10   patients at WSH.  Dkt. 84.  Even if they were similarly situated, the Defendant asserts that the

11   SCC's residential worker rates of pay are rationally related to a legitimate state interest.  *Id.*  The

12   Defendant also moves for dismissal of the Plaintiffs' remaining Eighth and Fourteenth

13   Amendments Due Process claims.  *Id.*  The Plaintiffs' oppose the motion (Dkt. 96) and the

14   motion is ripe for consideration.

15       The Plaintiffs also move to strike the Declaration of Jennifer Colbert, RN (Dkt. 87), who

16   discusses the SCC's practices and procedures as they relate to the assignment of resident workers

17   to cleaning assignments.  Dkt. 96.

18                              **II.      DISCUSSION**

19   **A.      MOTION TO STRIKE**

20       For purposes of this motion alone, the Plaintiffs' motion to strike the Colbert declaration

21   (Dkt. 87) should be granted.  Consideration of that declaration is unnecessary to decide the

22   motion for summary judgment.

23

24

1        **B.**      **SUMMARY JUDGMENT STANDARD**

2         Summary judgment is proper only if the pleadings, the discovery and disclosure materials

3 on file, and any affidavits show that there is no genuine issue as to any material fact and that the

4 movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). The moving party is

5 entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

6 showing on an essential element of a claim in the case on which the nonmoving party has the

7 burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue

8 of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

9 for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

10 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

11 metaphysical doubt."). Conversely, a genuine dispute over a material fact exists if there is

12 sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

13 the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986);

14 *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.

15 1987).

16         The determination of the existence of a material fact is often a close question. The court

17 must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

18 e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

19 *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

20 of the nonmoving party only when the facts specifically attested by that party contradict facts

21 specifically attested by the moving party. The nonmoving party may not merely state that it will

22 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

23 to support the claim. *T.W. Elect. Service Inc.*, at 630 (relying on *Anderson, supra*). Conclusory,

24

ORDER ON MOTION FOR SUMMARY JUDGMENT - 10

1    non-specific statements in affidavits are not sufficient, and "missing facts" will not be

2    "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

3        **C.      CLAIMS UNDER 42 U.S.C. § 1983 GENERALLY**

4        In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

5    conduct complained of was committed by a person acting under color of state law, and that (2)

6    the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

7    laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

8    *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

9    remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

10   F.2d 1350, 1354 (9th Cir. 1985).

11       **D.      FOURTEENTH AMENDMENT - EQUAL PROTECTION – PAY CLAIM**

12       "The Equal Protection Clause of the Fourteenth Amendment commands that no State

13   shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

14   essentially a direction that all persons similarly situated should be treated alike."  *Gallinger v.*

15   *Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018)(*internal citations omitted*).  The first step in

16   analyzing Equal Protection claims, "is to identify the state's classification of groups."  *Id.*

17   (*internal quotation marks and citations omitted*).  After a classified group is identified, the court

18   looks for a control group, "composed of individuals who are similarly situated to those in the

19   classified group in respects that are relevant to the state's challenged policy."  *Id.* (*internal*

20   *quotation marks and citations omitted*).   If the two groups are similarly situated, the court

21   determines the appropriate level of scrutiny and then applies it.  *Id.*

22

23

24

1        1.  Classified Group, Control Group and Whether they are Similarly Situated

2        Here, SCC residents are the classified group.  Plaintiffs argue that SCTF residents and

3    patients at WSH are the control groups that are similarly situated to the Plaintiffs for purposes of

4    scrutinizing the variation in pay.

5        The Plaintiffs are not similarly situated to the SCTF residents or the WSH patients for

6    purposes of pay.  While people in both groups have been involuntarily detained and all three

7    institutions have work programs, that is where the similarity ends.

8        The Plaintiffs are not similarly situated to WSH patients.  The Plaintiffs have been

9    committed to a total confinement facility as sexually violent predators under RCW § 71.09.

10   "Sexually violent predators are in a special category of civilly committed offenders because they

11   have a demonstrated sexually violent criminal history and are mentally ill, thereby portending the

12   likelihood of future sexually violent behavior."  *Taylor v. San Diego Cty.*, 800 F.3d 1164, 1172–

13   73 (9th Cir. 2015).  "[T]he state has an elevated interest in ensuring that they are identified,

14   treated, and detained for as long as they meet the sexually violent predator criteria."  *Id.*  The

15   Plaintiffs' treatment, including their vocational treatment and pay incentives, are specifically

16   designed for each individual to "reduce the likelihood of future sexual offenses through

17   addressing modifiable risk factors such as anti-social life goals and future sexual offenses."  Dkt.

18   85, at 2.  Unlike those at WSH, the SCC resident's pay is tied to their participation in treatment,

19   their advances in treatment, and their behavior.  SCC residents are given strong incentives to

20   participate because SCC staff feels that there is "therapeutic value in work" and in incentive pay

21   for SCC residents. Dkt. 97-1, at 51.  In contrast, only 10%-20% of patients at WSH participate in

22   the work program, and some only for 15 minutes a week.  Patients at WSH have not been civilly

23

24

1    committed as sexually violent predators.  There is no showing that the treatment plans for

2    patients at WSH and residents at SCC are the same.

3         SCC residents are not similarly situated to SCTF residents for purposes of the pay scale.

4    While SCTF residents at one time were designed as sexually violent predators, they have

5    advanced in their treatment to the degree to which they were not deemed as much of a risk of

6    reoffending.  With their release to a less restrictive alternative and as a part of their transition

7    plans, SCTF residents (pre-pandemic) worked in jobs in the community (and were paid at the

8    employer's rate), grocery shopped, and ran personal errands. They now are expected to work in

9    the SCTF work program, cook, and maintain a budget.  This increased level of responsibility and

10   freedom demonstrates that SCC residents are not similarly situated to SCTF residents.

11        Even if these groups were similarly situated, the pay disparity does not violate the Equal

12   Protection Clause, given the applicable level of rational basis scrutiny.  All disparity complained

13   of has a rational basis, as described above and below.

14        2.  <u>Standard of Review – Rational-Basis and its Application</u>

15        "The Equal Protection Clause does not require identical treatment; rather, it guarantees

16   that the government will not classify individuals on the basis of impermissible criteria." *Seeboth*

17   *v. Allenby*, 789 F.3d 1099, 1104 (9th Cir. 2015)(*internal quotation marks and citations omitted*).

18   A rational-basis review is the appropriate standard here because the pay disparity implicates

19   neither a suspect classification nor a fundamental right. *See Gallinger,* at 1017.  Accordingly, the

20   Defendant's decision to maintain the pay disparity should be upheld if it is "rationally related to

21   a legitimate state interest." *Seeboth,* at 1104.  Because the difference in treatment here is not

22   based on either a suspect classification or a fundamental right, the burden is on the Plaintiffs, as

23

24

1    the parties attacking the decision, "to negate every conceivable basis which might support it."

2    *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012).

3          The Defendant has shown that the rates of pay are rationally related to legitimate state

4    interests.  Further, the Plaintiffs have not "negated" these bases.  The Defendant points to three

5    state interests for the differences in pay: saving money, incentivizing work, and limiting resident

6    access to unnecessary or superfluous possessions.  Dkt. 84.

7          Fiscal considerations are legitimate governmental interests.  *Lyng v. Int'l Union United*

8    *Auto., Aerospace and Agr. Implement Workers of Am, v. UAW,* 485 U.S. 360, 373 (1988).  While

9    the Plaintiffs argue that the Defendant's reliance on *Lyng* is misplaced, the Plaintiffs point to a

10   portion of the dissent.  Dkt. 96, at 9.  Moreover, the Defendant has shown that the fiscal

11   considerations of saving money were woven into treatment considerations for the Plaintiffs.  In

12   the 2010 letter informing SCC residents why the pay rates were being reduced, the SCC explained

13   that the budget had been cut.  Dkt. 97-1, at 49.  It then let the SCC residents know that because

14   staff felt that work activities had therapeutic value, they chose to keep the same number of

15   positions.  *Id.*  Accordingly, they were forced to reduce participants' hourly pay.  *Id.*  In his

16   discussion of his time working at WSH, Plaintiff Anderson indicated that when WSH faced a

17   change in the amount it was required to pay patient workers, it simply reduced the number of

18   positions available, evincing a different view on the value of work for the WSH patients.  Dkt. 98.

19   The Defendant has shown that treatment considerations for the SCC residents and budget restraints

20   are rationally related to the differences in pay.

21         The Defendant has demonstrated that the rates of pay are rationally related to encourage

22   residents' willingness to work, which is a part of many of the SCC residents' treatment plans.  At

23   the current rate of pay, people in the program are less likely to stop working because they have

24

saved sufficient funds.  Defendant also points out that the SCC residents' rates of pay are set to limit resident access to unnecessary or superfluous possessions.  The Defendant points out concerns with an unsanctioned resident economy and its impact on treatment plans and institutional order.  While the Plaintiffs argue that the prior higher rates of pay (from before 2010) did not result in a reduction in the residents' willingness to work they offer no evidence to support their contention.  Further, the Plaintiffs maintain that the higher rates of pay in the past did not create access to unnecessary possessions.  They argue that the SCC's concern about an unsanctioned resident economy and its impact on treatment plans and institutional order fails to account for the tight control the SCC exercises over their ability to get possessions.  The Plaintiffs fail to acknowledge the administrative burdens the SCC had in the past and would have again in order to keep track of their increased ability to purchase various items. These administrative considerations are legitimate state interests which are rationally related to the differences in pay between the SCC residents, the SCTF residents, and the patients at WSH. *See Armour,* at 682.

### 3.  Conclusion on Equal Protection Claim

The Defendant's motion for summary judgment on the Plaintiffs' Equal Protection claim (Dkt. 84) should be granted.  The Plaintiffs have failed to point to sufficient issues of fact to preclude summary judgment and the Defendant is entitled to a judgment as a matter of law.  The claim should be dismissed with prejudice.

## E.  EIGHTH AND FOURTEENTH AMENDMENTS – REQUIREMENT TO WORK AND WORK CONDITIONS CLAIM

As civil detainees, the Plaintiffs claims regarding the conditions of their confinement (both the SCC's inclusion of vocational training incentives in the majority of their treatment plans and work conditions) are governed by the Fourteenth Amendment and not the Eighth Amendment.

*See Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004)(holding the Fourteenth Amendment standard applies to conditions of confinement when detainees have not been convicted of a crime).  Accordingly, to the extent that they raise Eighth Amendment claims, the claims should be dismissed and their claims will be analyzed under the Fourteenth Amendment.

Under the Due Process Clause of the Fourteenth Amendment, an individual detained under civil process cannot be subjected to conditions that amount to punishment." *King v. Cty. of Los Angeles*, 885 F.3d 548, 556–57 (9th Cir. 2018)(*internal quotation marks and citations omitted*).

"[C]onditions of confinement are presumptively punitive if they are identical to, similar to, or more restrictive than, those in which a [civil detainee's] criminal counterparts are held." *King,* at 557.  If a condition of confinement is punitive, "the burden shifts to the defendant to show (1) legitimate, non-punitive interests justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to these interests." *Id.* (*internal quotation marks and citations omitted*).

While acknowledging that they do not technically have to participate, the Plaintiffs here assert that the SCC resident worker program is punitive and that they are functionally forced to participate if they want to eventually be released.  Plaintiffs have failed to show that the incentives given to SCC residents to participate in the vocational portion of their treatment (if applicable) is "identical to, similar to, or more restrictive than" those in which their criminal counterparts have such that those requirements are punitive. *King,* at 557.  Further, even if the incentives that those who are able to participate in the program did amount to punishment, the Defendant has shown that there are legitimate interest in requiring their participation in work activities as a part of their treatment - to "provide residents . . . with basic work skills, work

1   experience and evaluation which can be of benefit in obtaining gainful employment following

2   their transition from SCC . . ."  Dkt. 85-1, at 2.  Further, by giving incentives to participate but

3   by making participation optional, the Defendant has shown that the work program incentives are

4   not excessive to the governmental interests in effectively treating SCC residents. The Plaintiffs'

5   claims that the incentives to participate in the vocational program violate their Substantive Due

6   Process Rights under the Fourteenth Amendment should be dismissed.

7          The Plaintiffs last assert that the failure to provide adequate safety training, have worker

8   safety committees, and lack of training in the proper use of PPE (and being forced to ask for PPE

9   from staff) in the vocational programs are punitive, particularly considering the incentives to

10  participate.  Dkt. 96.

11         The Plaintiffs have failed to show that their work conditions "are identical to, similar to,

12  or more restrictive than," the work conditions of their criminal counterparts such that they are

13  punitive in nature.  *King,* at 557.  The Plaintiffs file self-serving affidavits that the safety training

14  is inadequate, but fail to point to specific areas where the training is lacking.  While they note

15  that one prison one of them was in years ago had a worker safety committee, they fail to

16  demonstrate that all prisons, or even most, have them.  They point out that they do not get PPE

17  training.  They fail to show that their criminal counterparts get PPE training.  The Plaintiffs'

18  claim that their work conditions violate their Substantive Due Process Rights under the

19  Fourteenth Amendment should be dismissed.

20         To the extent that the Plaintiffs assert a Substantive Due Process Right to be paid a

21  particular amount, they did not respond to the Defendant's motion for summary judgment on that

22  claim.  The Plaintiffs have failed to demonstrate that their rate of pay amounts to punishment.

23  Further, the Defendant points to legitimate, non-punitive interests justifying the rate of pay and

24

1    that the rate of pay is not excessive low in relation to these interests.  The Plaintiffs' claim that

2    the rate of pay they receive violates their Substantive Due Process Rights under the Fourteenth

3    Amendment should be dismissed.

4        **F.  CONCLUSION**

5        The Defendant's motion for summary judgment on all Plaintiffs' claims should be granted.

6    This case should be dismissed.

7                                    **III.    ORDER**

8        Therefore, it is hereby **ORDERED** that:

9    •   The Plaintiffs' motion to strike the Declaration of Jennifer Colbert, RN (Dkt. 96) **IS**

10       **GRANTED**;

11   •   The Defendant's Motion for Summary Judgment (Dkt. 84) **IS GRANTED;** and

12   •   This case **IS DISMISSED**.

13       The Clerk is directed to send uncertified copies of this Order to all counsel of record and

14   to any party appearing *pro se* at said party's last known address.

15       Dated this 8th day of February, 2022.

16

17

18       ROBERT J. BRYAN
         United States District Judge

19

20

21

22

23

24